UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| GABRIEL WILSON,<br><br>    Plaintiff,<br><br> v.<br><br>PIERCE COUNTY, a municipal corporation organized under the laws of the State of Washington, PIERCE COUNTY JAIL, PIERCE COUNTY JAIL CORRECTIONAL OFFICERS JOHN DOE (1) and JANE DOE (1), Nurses STEVE CARVER RN, KRISTIN BERRES, RN,<br><br>    Defendants.<br><br>PIERCE COUNTY,<br><br>    Third-Party Plaintiff,<br><br> v.<br><br>NAITAALII JEOVAN TOLEAFOA, JOHN DOES 1-3, and CORRECT CARE SOLUTIONS LLC,<br><br>    Third-Party Defendants. | CASE NO. 16-5455 RJB<br><br>ORDER ON DEFENDANT PIERCE COUNTY'S MOTION FOR SUMMARY JUDGMENT |

This matter comes before the Court on Defendant Pierce County, Washington's Motion for Summary Judgment (Dkt. 48) and Pierce County's motion to strike (Dkt. 59). Oral argument has been requested, but is not necessary in deciding the motions. The Court has considered the pleadings filed regarding the motions and the remaining file herein.

In this case, Plaintiff, a former prisoner, alleges that Defendant Pierce County violated his federal constitutional rights and was negligent when it housed him in the jail with violent rival gang members who beat him. Dkt. 26. He also claims the County was negligent related to medical treatment for a leg lesion which was unconnected to the attack. *Id*.

Defendant Pierce County now moves for summary dismissal of all claims Plaintiff asserts against it. Dkt. 48. Plaintiff opposes the motion to dismiss the constitutional claim related to the gang attack. Dkt. 53. Plaintiff does not respond to the motion to dismiss the negligence claims. For the reasons stated below, Pierce County's summary judgment motion (Dkt. 48) should be granted and its motion to strike (Dkt. 59) should be granted, in part, and denied, in part.

## I. FACTS AND PROCEDURAL HISTORY

**A. ATTACK BY RIVAL GANG MEMBERS**

Plaintiff, who is around 50, was a member of the Nortenos street gang in the 1980s while living in North California. Dkt. 49, at 24-26. When he moved to Washington around 1987, he left the gang. *Id*. Plaintiff has gang related tattoo "sleeves" on both his forearms. *Id.*, at 27.

Plaintiff was booked into Pierce County jail on March 31, 2014. Dkt. 49, at 32. He didn't tell anyone during the booking process that he was a former gang member, and there was nothing in his prior records about gang membership or gang related crime. Dkt. 49, at 33. The booking officer, Correctional Deputy Hector Hernandez, states that Plaintiff "had numerous tattoos that were previously listed in the LINX system from prior bookings," and so asked

Plaintiff if "he had any new tattoos that needed to be noted." Dkt. 51, at 2. Plaintiff told him, "no." *Id.* Deputy Hernandez was not aware that any of Plaintiff's tattoos were an indication he was part of a gang. *Id.* As an officer in Pierce County, Washington, Deputy Hernandez states that has "little to no exposure" to the Nortenos, a Northern California gang. *Id.* He did not enter any information into the computer system regarding Plaintiff's prior gang membership. *Id.* Deputy Hernandez states that pursuant to the jail's policy, if Plaintiff had told him of his prior gang affiliation or expressed concerns regarding the presence of rival gang members, Deputy Hernandez would have "entered the names of any known threating individuals under the 'Keep Separates' tab in the computer and the classification section would have taken such information into consideration in classifying and housing him - such as housing him in a pod separate from any of the inmates listed under the 'Keep Separates' tab." *Id.* In any event, Deputy Hernandez asked Plaintiff if "there was anything else [they] should know" or if he had "any other concerns." *Id.* Plaintiff told Deputy Hernandez that he had a "bad knee" and needed a "low bunk/tier." Dkts. 49, at 40; 50, at 11. Deputy Hernandez states that at the time (2014), the jail did not have "gang related violence issues." Dkt. 51, at 3. Corrections Sergeant Jackie Caruso states that she reviewed at least four years of incident reports at the jail, and there were no known incidents of gang related violence in 2010-2014. Dkt. 50, at 3.

After Plaintiff was interviewed by Deputy Hernandez, he was subject to the jail's classification procedure. Dkt. 50, at 3. Pursuant to the jail's "Policy and Procedures Manual" in effect at the time, "classification" was defined as the process that placed inmates "in a housing area that appears to be best suited for the individual's security classification, program participation, and personal and medical/mental health needs." Dkt. 50, at 8. Inmates were classified as either requiring minimum security (level 1 & 2), medium security (levels 3, 4, & 5),

or maximum security (level 6, 7, 8). *Id*. Classification is to ensure "safety and security," and so is based, in part, on by "any known reason an inmate needs to be kept separate from other inmates – such as where there is a request by the inmate . . . or where there are other inmates at the [jail] who are known to be codefendants, victims, . . . share gang affiliation, or members of rival gangs." Dkt. 50, at 2. Classification of inmates is subject to review, upon receipt of new information such as "gang affiliation, medical or mental health, protective custody, behavioral issues . . ." Dkt. 50, at 9.

Plaintiff was originally classified as a "level 4" and placed in one unit, but after he engaged in alleged disruptive behavior, he was reclassified as a "level 3" and moved. Dkts. 50, at 3; 54, at 4. Plaintiff's move took place on April 6, 2014; the two officers on duty in his new unit did not know of Plaintiff's prior gang affiliation. Dkt. 49, at 85 and 99. A little after Plaintiff arrived on the new unit, the cell door opened (it was meal time and most of the unit's cell doors were automatically opened), and Plaintiff's cellmate left to eat. Dkt. 49, at 41.

Plaintiff turned and noticed that three individuals were standing at the cell door. *Id.* One of these individuals was then 20-year-old Naitaalii Jeovan Toleafoa, a member of the Eastside Loco Surenos street gang, who was in the jail on first degree murder charges. Dkts. 49, at 93; 55, at 46. Plaintiff maintains that the Eastside Loco Surenos gang is a rival of the Nortenos gang. Dkt. 54, at 3. The officers on duty in the unit were unaware that either of these men had current or prior gang affiliation or that these were rival gangs. Dkt. 49, at 85 and 99. According to Plaintiff, the three men did not have gang tattoos. Dkt. 49, at 58. Plaintiff states he did not know any of them, but that the "youngster" "was just looking at [his] tattoos and smiling." Dkt. 49, at 41. These three individuals rushed into the cell, kicked, punched, and beat Plaintiff. Dkt. 49, at 43-46. As they left, they shut the cell door. *Id.* According to Plaintiff, none of the guards

checked the cells to make sure the inmates were o.k. after the cell doors were opened, but were too busy serving dinner. Dkt. 54, at 3.

Plaintiff asserts that after a period of time, he stood, someone saw him through the window in his cell door, and that person rushed to get help. Dkt. 49, at 43-46. Plaintiff was found in his cell in a pool of blood, with blood on the walls. Dkt. 49, at 59.

The unit was placed in lockdown, which meant that all inmates were ordered to their cells. Dkt. 49, at 88-89. Mr. Toleafoa remained outside his cell. *Id.* Corrections Officer Tim Rankin, who was on duty that day, saw Mr. Toleafoa sitting with all his property packed in his mattress cover. Dkt. 49, at 89. Officer Rankin heard Mr. Toleafoa say, "I'm all packed up and ready to go!" *Id.* Mr. Toleafoa was bloody and had swollen knuckles. Dkt. 49, at 92 and 102. He was charged criminally with assaulting the Plaintiff. Dkt. 55, at 21.

Plaintiff was taken by ambulance to the hospital. Dkt. 49, at 59. He sustained multiple injuries, including a nasal bone fracture, facial contusions and lacerations, and a right rib fracture. Dkt. 49, at 59.

Plaintiff states that while he was in the infirmary after the attack, another inmate told him that "Jane Doe" corrections officer made a comment about "teaching him a lesson" just before he was moved from one unit to another. Dkt. 49, at 31. Plaintiff does not know the inmate's name or the corrections officer's name. Dkt. 49, at 31. In his declaration filed to oppose the motion for summary judgment, Plaintiff now asserts that the "Jane Doe officer" was a jail staff member with whom he had a disagreement. Dkt. 54, at 3.

B. **TREATMENT OF LEG LESION**

The following facts are in the Court's Order Granting Defendants Carver and Berres' Motion for Summary Judgment (Dkt. 62, at 2-3), and are repeated here, for ease of reference:

On June 19, 2014, Plaintiff made a healthcare request, which stated, "I have a zit like soar [sic] on my right leg. It started out itching but now its [sic] grown and its [sic] very red and its [sic] painful, and it keeps growing." Dkt. 47, at 8. The next day, he was seen by Defendant Berres, who diagnosed Plaintiff with a lesion, thought to be an insect bite, and prescribed oral antibiotics. *Id.*, at 15.

On June 22, 2014, Plaintiff made a second healthcare request, stating, "[t]he so called bug bite on my [right] leg has gotten worse and [now] is a throbbing pain. I can't sleep cause [sic] just the slightest touch sends horrible pain, and it hurts to walk." Dkt. 47, at 9. The response states only, "[s]een by SCarver DNP on 6/20/14." *Id.*

On June 23, 2014, Plaintiff sent a third healthcare request form, which provided, "I now believe I have merca on my [right] leg. It has more than tripled its size since I saw the doctor and my lower leg is completely swollen. This is the 3rd [request] I've put in. Can someone please help me!" Dkt. 47, at 10.

On June 24, 2014, Plaintiff was seen by Defendant Carver, who noted that the lesion had grown. Dkt. 47, at 15. Defendant Carver incised and drained the lesion, gave Plaintiff an injection of antibiotic, and placed him on additional antibiotics. *Id.* The fluid drained from the lesion was sent for culture, Dkt. 47, at 18, and his antibiotics were changed as a result. *Id.*

Plaintiff was seen again on July 10, 2014, and the lesion was noted to be healing slowly. *Id.,* at 16. He was given an additional antibiotic. *Id.* On August 5, 2014, Plaintiff was again seen and reported that he lesion was "just about healed." *Id.* He sought no further treatment.

## C. PROCEDURAL HISTORY AND PENDING MOTIONS

On April 5, 2016, Plaintiff filed this case in Pierce County, Washington Superior Court. Dkt. 1-3. The case was removed on June 8, 2016. Dkt. 1.

In his Second Amended Complaint, Plaintiff asserts claims against Pierce County for violation of his eighth amendment right and for negligence for: (1) failing to have a policy regarding the housing of rival gang members at the jail, and (2) to the extent it does have a policy to allow rival gang members in the same unit, for allowing "them to wander throughout the unit unsupervised," . . . allowing "them to assault Plaintiff," and for providing "insufficient staffing." Dkt. 26, at 9-10. He makes claims against "Defendants Pierce County correctional officer John

Doe (1) and Jane Doe (1)" for violation of his eighth amendment rights and for negligence in connection with the County's housing him with violent rival gang members. *Id*.

Regarding the medical treatment he received for his leg lesion, Plaintiff asserts a claim against the County for negligence. *Id.*, at 11.

Defendants Steve Carver and Kristin Berres motion to summarily dismiss Plaintiff's claims against them for violation of his Eighth Amendment rights and for negligence regarding the treatment of his leg lesion was granted and the claims have been dismissed. Dkt. 62.

Defendant Pierce County now moves to have all claims asserted against it dismissed. Dkt. 48. Plaintiff opposes the motion to dismiss his claim that the County violated his eighth amendment rights, but does not oppose dismissal of the negligence claims. Dkt. 53. In reply, the County moves to strike Plaintiff's declaration and some of his other submissions, and again maintains that all claims asserted against it should be dismissed. Dkt. 59.

This opinion will first consider the County's motion to strike, then its motion to summarily dismiss the constitutional claim asserted against it and lastly, its motion to summarily dismiss the state law claims.

## II. DISCUSSION

### A. COUNTY'S MOTION TO STRIKE

The County moves to strike Plaintiff's declaration as inadmissible hearsay or as conclusory or speculative statements unsupported by any evidence. Dkt. 53. The County also moves to strike the declaration of McDonald. *Id.*

The County's motion to strike the portion of Plaintiff's declaration which provides that an unidentified inmate told Plaintiff that an unidentified corrections officer (with whom Plaintiff now believes he had a disagreement) said that she was going to "teach [Plaintiff] a lesson" just

before he got moved, should be granted as inadmissible hearsay. For purposes of this motion alone, the motion to strike the remainder of the declaration should be denied, without prejudice. The remainder of Plaintiff's declaration was of limited relevance to the summary judgment motion.

For purposes of this motion alone, the County's motion to strike the declaration of McDonald should be denied without prejudice. Like Plaintiff's declaration, the attachments to the declaration were of limited relevance, but were considered in deciding this motion.

**B. STANDARD FOR MOTION FOR SUMMARY JUDGMENT**

Summary judgment is proper only if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of a claim in the case on which the nonmoving party has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1985). There is no genuine issue of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find for the non moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)(nonmoving party must present specific, significant probative evidence, not simply "some metaphysical doubt."). *See also* Fed. R. Civ. P. 56(e). Conversely, a genuine dispute over a material fact exists if there is sufficient evidence supporting the claimed factual dispute, requiring a judge or jury to resolve the differing versions of the truth. *Anderson v. Liberty Lobby, Inc.*, 477 .S. 242, 253 (1986); *T.W. Elec. Service Inc. v. Pacific Electrical Contractors Association*, 809 F.2d 626, 630 (9th Cir. 1987).

1  The determination of the existence of a material fact is often a close question. The court

2  must consider the substantive evidentiary burden that the nonmoving party must meet at trial –

3  e.g., a preponderance of the evidence in most civil cases. *Anderson*, 477 U.S. at 254, *T.W. Elect.*

4  *Service Inc.*, 809 F.2d at 630. The court must resolve any factual issues of controversy in favor

5  of the nonmoving party only when the facts specifically attested by that party contradict facts

6  specifically attested by the moving party. The nonmoving party may not merely state that it will

7  discredit the moving party's evidence at trial, in the hopes that evidence can be developed at trial

8  to support the claim. *T.W. Elect. Service Inc.*, 809 F.2d at 630 (relying on *Anderson, supra*).

9  Conclusory, non specific statements in affidavits are not sufficient, and "missing facts" will not

10  be "presumed." *Lujan v. National Wildlife Federation*, 497 U.S. 871, 888-89 (1990).

**C.  EIGHTH AMENDMENT CLAIM PURSUANT TO SECTION 1983**

12  In order to state a claim under 42 U.S.C. § 1983, a complaint must allege that (1) the

13  conduct complained of was committed by a person acting under color of state law, and that (2)

14  the conduct deprived a person of a right, privilege, or immunity secured by the Constitution or

15  laws of the United States. *Parratt v. Taylor*, 451 U.S. 527, 535 (1981), *overruled on other*

16  *grounds*, *Daniels v. Williams*, 474 U.S. 327 (1986). Section 1983 is the appropriate avenue to

17  remedy an alleged wrong only if both of these elements are present. *Haygood v. Younger*, 769

18  F.2d 1350, 1354 (9th Cir. 1985), *cert. denied*, 478 U.S. 1020 (1986). To state a civil rights claim,

19  a plaintiff must set forth the specific factual bases upon which he claims each defendant is liable.

20  *Aldabe v. Aldabe*, 616 F.2d 1089, 1092 (9th Cir. 1980).

21  A county is responsible for a constitutional violation, however, only when an action taken

22  pursuant to a county policy of some nature caused the violation. *Monell v. Dep't of Soc. Servs.*,

23  436 U.S. 658, 690–91 (1978). In order to successfully plead §1983 liability on the part of the

County, Plaintiff must allege: (1) he was deprived of a constitutional right; (2) the County had a policy; (3) the policy amounted to a deliberate indifference to his constitutional right; and (4) the policy was the moving force behind the constitutional violation. *Mabe v. San Bernardino Cty., Dep't of Pub. Soc. Servs.*, 237 F.3d 1101, 1110–11 (9th Cir. 2001)(*internal quotations omitted*).

Plaintiff alleges that Pierce County deprived him of his Eighth Amendment right to be free from violence while in custody. "The Eighth Amendment imposes a duty on prison officials to protect inmates from violence at the hands of other inmates." *Cortez v. Skol*, 776 F.3d 1046, 1050 (9th Cir. 2015). "A prisoner seeking relief for an Eighth Amendment violation must show that the officials acted with deliberate indifference to the threat of serious harm or injury to an inmate." *Labatad v. Corr. Corp. of Am.*, 714 F.3d 1155, 1160 (9th Cir. 2013) (*citing Gibson v. County of Washoe*, 290 F.3d 1175, 1187 (9th Cir.2002)). "A prison official must be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and must also draw the inference." *Id.* (*internal quotations omitted*).

The County argues that the eighth amendment claim asserted against it should be dismissed because the County has both a formal policy and informal practices that consider gang affiliation when making decisions about an inmate's classification/housing at the jail. Dkt. 48. It also maintains that it did not have a policy or practice that routinely allowed unsupervised inmates to enter other inmate's cells. Dkt. 48. It further asserts that Plaintiff cannot demonstrate that its policies and practices amounted to a deliberate indifference to Plaintiff's constitutional rights or that such a policies and practices caused a constitutional violation. *Id.*

   *a. Policy?*

Official policy includes the decisions of the lawmakers, "the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law."

*Connick v. Thompson*, 131 S. Ct. 1350, 1359 (2011)(*internal quotations and citations omitted*). The official policy in question then, may be either "formal or informal." *City of Saint Louis v. Praprotnik*, 485 U.S. 112, 131 (1988).

A formal policy is "a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986) (*plurality opinion*).

An informal policy exists when a plaintiff "can prove the existence of a widespread practice that, although not authorized by an ordinance or an express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law." *Praprotnick*, at 127. A plaintiff must show a pattern of similar incidents in order for the factfinder to conclude that the alleged informal policy was "so permanent and well settled" as to carry the force of law. *Id.* Usually, an informal policy cannot be established by a single constitutional deprivation. *Christie v. Iopa,* 176 F.3d 1231, 1235 (9th Cir. 1999). There are, however, situations in which isolated constitutional violations are sufficient to establish a municipal policy. *Id.* A county "can be liable for an isolated constitutional violation when the person causing the violation has final policymaking authority." *Id.* A county also "can be liable for an isolated constitutional violation if the final policymaker ratified a subordinate's actions." *Id*., at 1238.

Assuming that the evidence supporting this claim is admissible, which it is not, to the extent that Plaintiff points to the "Jane Doe" corrections officer's alleged comment (overheard by another inmate) that she wanted to "teach [Plaintiff] a lesson," right before he got moved into the unit where he was attacked, Plaintiff points to no evidence that this was a policy or practice

of the County. The County is not liable under § 1983 pursuant to a theory of *respondeat superior. Gibson,* at 1186. To the extent that he bases his constitutional claims against the County on this alleged statement by this unidentified corrections officer, his claim should be dismissed and no further analysis is necessary.

Although Plaintiff makes bare assertions to the contrary, Pierce County has both a written policy and informal practices of considering gang affiliation in determining an inmate's classification and housing. Under the jail's "Policy and Procedures Manual," classification is based, in part, on "gang affiliation, medical or mental health, protective custody, behavioral issues . . ." Dkt. 50, at 9. Further, during the booking process, Pierce County booking officers routinely asked about any concerns an inmate may have, and if the inmate reveals gang affiliation or concern about the presence of rival gang members, the booking officer would have "entered the names of any known threating individuals under the 'Keep Separates' tab in the computer and the classification section would have taken such information into consideration in classifying and housing [the inmate] - such as housing him in a pod separate from any of the inmates listed under the 'Keep Separates' tab." Dkt. 51, at 2. The County considers known gang affiliation and other known reasons to keep inmate separate in the classification and housing of its inmates. Plaintiff has failed to show that the County did not have a policy to address housing violent rival gangs together.

Plaintiff argues in his Response, that although the jail has a formal policy that prohibits inmates from entering other inmate's cells, in practice, there are times when the cell doors are open and inmates are able to move freely about the unit unsupervised. Dkt. 53. Plaintiff asserts that the jail is aware that dangerous inmates are housed on this unit, and there are times in the

day where it routinely fails to adequately monitor whether inmates were going in and out of each other's cells. *Id.* He also asserts that the jail is not sufficiently staffed. *Id.*

Plaintiff points to no evidence to support his suppositions. He offers no evidence that failing to monitor inmates at times or understaffing was in some manner a policy or practice of the jail. Plaintiff points to no evidence that the jail's staffing decisions were inadequate. He fails to provide any evidence that dangerous inmates were routinely allowed to roam unsupervised and enter other inmate's cells. Plaintiff does not demonstrate the "existence of a widespread practice [regarding its monitoring in the unit or staffing decisions] that, although not authorized by an ordinance or an express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law." *Praprotnick*, at 127. Plaintiff fails to show that the County had a policy or practice of allowing dangerous unsupervised inmates to move freely about the unit and enter other inmate's cells.

b. *County's Policies or Practices - Deliberate Indifference?*

In order to show that a County is deliberately indifferent, a §1983 plaintiff must demonstrate "that the facts available to [policymakers] put them on actual or constructive notice that the particular omission is substantially certain to result in the violation of the constitutional rights of their citizens." *Castro v. Cty. of Los Angeles*, 833 F.3d 1060, 1075 (9th Cir. 2016)(*cert. denied sub nom. Los Angeles Cty., Cal. v. Castro*, 137 S. Ct. 831 (2017)(*internal citations omitted*)). If they do, "the dictates of *Monell* are satisfied." *Id.*

Plaintiff has failed to show that any of the County's policies or practices amounted to deliberate indifference to his constitutional rights. He makes no showing that there were any facts available to policy makers that their policies and practices regarding the classification or housing of inmates, whether gang members or not, "were substantially certain" to result in a

violation of Plaintiff's constitutional rights. The Ninth Circuit has held that a jail's policy of housing rival gang members together does not amount to a per se violation of the Eighth Amendment. *Labatad v. Corr. Corp. of Am.*, 714 F.3d 1155, 1160 (9th Cir. 2013). "The number of gang members housed and the high representation of certain gangs would place an unmanageable burden on prison administrators were they required to separate inmates by gangs." *Id.*

Moreover, Plaintiff makes no showing that there were facts available to the County policy makers that their staffing decisions and monitoring practices of the unit during meal times (to the extent that staffing decisions and monitoring amounted to a policy or practice) "were substantially certain" to result in a violation of Plaintiff's constitutional rights. There had not been any known gang related violent incidences in the jail for at least four years prior to the attack. Plaintiff offers no evidence of other inmates being injured as a result of the jail's staffing decisions or lack of monitoring. Plaintiff offers no evidence to support his assertions, as he must to avoid summary judgment.

          c. *County's Polices or Practices Resulted in Violation of Plaintiff's Constitutional Rights?*

In any case alleging municipal liability under § 1983, is the question of "whether there is a direct causal link between a municipal policy or custom and the alleged constitutional deprivation." *Castro v. Cty. of Los Angeles*, 833 F.3d 1060, 1075 (9th Cir. 2016)(*cert. denied sub nom. Los Angeles Cty., Cal. v. Castro*, 137 S. Ct. 831 (2017)(*internal citations omitted*)).

Even if Plaintiff were able to point to a policy or practice that demonstrated deliberate indifference to his constitutional rights, he has failed to demonstrate the policies and practices of the County caused a violation of Plaintiff's constitutional rights.

Plaintiff has failed to show that there was a direct causal link between Pierce County's classification/housing policies and practices and the violation of his constitutional rights. Plaintiff acknowledges that he did not tell County employees of his prior gang affiliation and offers no evidence that they knew of it. He offers no evidence that there was any connection between the attack and the housing and classification policies and practices of the jail.

Plaintiff has failed to show that there was a direct causal link between staffing decisions and/or jail's monitoring practices of the unit at meal times and the attack. Plaintiff does not demonstrate that the number of staff was directly connected to the attack. Aside from his bare assertions, he offers no evidence that the inmates were, as a practice, unsupervised. Plaintiff fails to point to any evidence that other inmates had been injured as a result of the jail's staffing/routine monitoring practices. Plaintiff makes no showing that the staffing decisions or the jail or that the unit's officers' failure to see Mr. Toleafoa enter Plaintiff's cell that day was a result of a County policy or practice.

He makes no showing that any of the County's polices or practices were the "moving force" behind a violation of his constitutional rights. *Mabe,* at 1111. Defendants' motion to summarily dismiss Plaintiff's eighth amendment claim should be granted.

**D. STATE LAW CLAIMS FOR NEGLIGENCE**

In Washington, "[a]n actionable claim for negligence includes four essential elements: (1) a duty owed to the complaining party; (2) a breach of that duty; (3) resulting injury; and (4) proximate cause between the breach and the resulting injury." *Stenger v. State,* 104 Wn.App. 393, 399 (2001)(*citing Pedroza v. Bryant,* 101 Wn.2d 226, 228 (1984)).

    1. <u>Negligence Claim Regarding Gang Attack</u>

1   Plaintiff does not oppose the County's motion to summarily dismiss this claim.

2  Moreover, Plaintiff has failed to point to sufficient facts to support his state claim for negligence

3  against the County regarding the gang attack. Plaintiff has failed to point to evidence that the

4  County breached its duty to protect him when it housed him with rival gang members. He has

5  failed to point to evidence that inmates were allowed to roam "unsupervised." He failed to

6  demonstrate that he was beaten as a result of the County's failure to have a policy to address the

7  housing of rival gang members or as a result of the staffing decisions/monitoring practices of the

8  jail. Defendant Pierce County's motion to summarily dismiss the negligence claim based on the

9  attack should be granted.

### 2. Negligence Claim Regarding Leg Lesion

11   Plaintiff's claim for negligence, based on the treatment of his leg lesion, asserted against

12  Defendant Pierce County, should be dismissed. Plaintiff did not oppose summary dismissal of

13  this claim. In any event, he fails to point to any evidence that Defendant Pierce County breached

14  its duty of care to him. Further, he has failed to point to any evidence that he was injured as a

15  result of the County's actions.

**E. REMAINING CLAIMS**

17   It is not wholly clear which claims, if any, remain for trial, which is set to begin on

18  November 6, 2017. By this order, all claims asserted against Pierce County, Washington are

19  dismissed. Claims asserted against Defendants Steve Carver and Kristing Berres related to the

20  treatment of Plaintiff's leg lesion have also been dismissed. Dkt. 62.

21   The Second Amended Complaint asserts claims against "Defendants Pierce County

22  correctional officers John Doe (1) and Jane Doe (1)" for violation of Plaintiff's eighth

23  amendment rights and for negligence in connection with the gang attack. Dkt. 26. To the extent

it is found liable for the Plaintiff's claims against it related to the attack, Defendant Pierce County asserts cross claims against Naitaalii Jeovan Toleafoa. Dkt. 31. To the extent it is found liable for the treatment of Plaintiff's leg lesion, Defendant Pierce County also makes cross claims against Correct Care Solutions LLC. *Id*.

Parties should be ordered to file a status report, on or before September 22, 2017, informing the Court which claims, if any, remain for trial.

### III. ORDER

Therefore, it is hereby **ORDERED** that:

- Defendant Pierce County's motion to strike (Dkt. 59) **IS GRANTED IN PART, AND DENIED, WITHOUT PREJUDICE, IN PART**;
- Defendant Pierce County's Motion for Summary Judgement Dismissal of All Claims (Dkt. 48) **IS GRANTED**; and
- All claims asserted against Defendant Pierce County **ARE DISMISSED;** and
- Parties **SHALL FILE** a status report, on or before **September 22, 2017**, informing the Court which claims, if any, remain for trial.

The Clerk is directed to send uncertified copies of this Order to all counsel of record and to any party appearing *pro se* at said party's last known address.

Dated this 5th day of September, 2017.

*[signature]*

ROBERT J. BRYAN
United States District Judge